

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-31-2001

# Mathews v. Kidder Peabody Co

Precedential or Non-Precedential:

Docket 00-2566

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Mathews v. Kidder Peabody Co" (2001). *2001 Decisions.* Paper 169.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/169

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 31, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-2566

JOHN W. MATHEWS; CAROLE ANN NUCKTON;
PATRICIA J. LESTER; JORDAN BRODSKY;
THOMAS C. CHESTNEY; DEBORAH W. TROEMNER;
WILLIAM J. WATERMAN, JR.; VERNON L. SCHATZ;
SUSANNE DIANE ANDERSON; LARRY C. ANDERSON;
GEORGE P. ARNOLD; ANN M. ARNOLD,

        Appellants

v.

KIDDER, PEABODY & CO., INC., a Delaware corporation;
KP REALTY ADVISERS, INC., a Delaware corporation;
HSM, INC., a Texas corporation; HENRY S. MILLER CO;
HENRY S. MILLER MANAGEMENT CORPORATION;
HENRY S. MILLER APPRAISAL CORPORATION;
HSM REAL ESTATE SECURITIES CORPORATION;
MILLER REAL ESTATE SERVICES CORPORATION, a
Texas corporation

APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

(D.C. No. 95-cv-00085)
District Judge: The Honorable Donetta W. Ambrose

Argued June 25, 2001

BEFORE: NYGAARD and WEIS, Circuit Judges, and
REAVLEY,* Circuit Judge.
_____

* Honorable Thomas M. Reavley, Circuit Judge for the United States
Court of Appeals for the Fifth Circuit, sitting by designation.

(Filed: July 31, 2001)

  Anthony P. Picadio, Esq. (Argued)
  Tybe A. Brett, Esq.
  Picadio, McCall, Kane & Norton
  600 Grant Street
  4710 USX Tower
  Pittsburgh, PA 15219
   Attorney for Appellants

  David L. McClenahan, Esq. (Argued)
  Kenneth M. Argentieri, Esq.
  Michael J. Lynch, Esq.
  Paul E. Del Vecchio, Esq.
  Kirkpatrick & Lockhart
  535 Smithfield Street
  Henry W. Oliver Building
  Pittsburgh, PA 15222
   Attorneys for Appellees Kidder,
  Peabody & Co., Inc and KP Realty
  Advisers, Inc.

  William M. Wycoff, Esq.
  Thorp, Reed & Armstrong
  301 Grant Street
  One Oxford Centre
  Pittsburgh, PA 15219
   Attorneys for Appellees HSM, Inc.,
  Henry S. Miller Co, Henry S. Miller
  Management Corporation, Henry S.
  Miller Appraisal Corporation, HSM
  Real Estate Securities Corporation
  and Miller Real Estate Services
  Corporation

OPINION OF THE COURT

NYGAARD, Circuit Judge.

The Appellants in this case are a number of self-professed conservative, first-time investors who purchased securities from Kidder Peabody & Co., Inc. and the Henry

S. Miller Organization. They claim that Kidder and Miller fraudulently misrepresented the securities as low-risk vehicles similar to municipal bonds. Ultimately, the securities failed and the Appellants brought civil RICO claims. After extensive discovery, the District Court granted summary judgment to Kidder and Miller and held that the Appellants' claims were barred by the applicable four-year statute of limitations. On appeal, the Appellants contend that the court erred in three major respects: It incorrectly concluded that the Appellants were injured at the time they purchased the securities; it erred in holding that the Appellants were on inquiry notice of their injuries no later than early 1990; and, finally, it erred in refusing to equitably toll the statute of limitations. We will affirm.

I. FACTS

This case involves a securities class action brought against Kidder, a retail brokerage house, and Miller, "a multi-faceted real-estate management, appraisal, and investment organization." App. at 35. In the early 1980s, brokerage houses began working with real estate companies, such as Miller, to offer investment opportunities. They often sought to take advantage of the booming construction markets in the south and southwest regions of the United States known as the "Sunbelt." The companies formed limited partnerships, purchased Sunbelt commercial real estate, and sold interests to the general public. They marketed the investments as tax shelters, long-term capital gain opportunities, and income-producing plans.

In 1981, Kidder and Miller created three separate investment funds. The two companies formed wholly owned subsidiaries to serve as general partners for the funds, and then sold limited partnerships to the public. The plan was to acquire commercial real estate properties in the Sunbelt, collect rental income (thus providing a steady, but modest, income stream for investors), and eventually sell the properties six to ten years later and collect substantial capital gains. The bulk of the return for investors was to come from appreciation in the properties.

3

Kidder prepared and distributed to its brokers a prospectus, sales information, a videotape, and other reference materials describing the first investment fund.1 In May 1992, Kidder began selling limited partnership units in that fund. By May 1986, it had sold units in all three funds to more than six thousand investors and raised approximately eighty-four million dollars. The funds purchased properties in Texas, Florida, Georgia, New Mexico, Arizona, Arkansas, and Illinois.

The crux of the Appellants' claims is that Kidder fraudulently suggested that the funds were low-risk, conservative investments suitable for low net-worth individuals. The Appellants believe that Kidder specifically targeted unsophisticated investors, intentionally misled them about the nature of the funds, and charged excessive fees and commissions. These acts allegedly constituted violations of the federal securities laws,2 wire fraud, 18 U.S.C. S 1343, mail fraud, 18 U.S.C. S 1341, and RICO violations.

Furthermore, the Appellants claim that Kidder conducted inadequate due diligence in choosing commercial real estate investments. As a result, at least in part, fund properties lost many of their key tenants, and quarterly distributions (to limited partners) fell to only a few dollars per unit. Additional economic factors also weakened the Sunbelt real estate market as a whole,3 and the value of the funds' investments plunged. Nonetheless, the Appellants claim that Kidder intentionally "lulled [them] into a false sense of

_____

1. There are numerous corporate defendants in this case. See App. at 33. In order to avoid confusion, we will refer to all the Defendants/Appellees collectively as "Kidder."

2. Specifically, the Appellants claim that Kidder violated S 17(a) of the Securities Exchange Act of 1933, 15 U.S.C. S 77q, S 12(2) of the Securities Exchange Act of 1933, 15 U.S.C. S 77I, and S 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. S 78j(b).

3. Corporate divisions merged and moved their offices; a gas and oil decline hit Texas in the mid-80s; Congress passed the 1986 Tax Reform Act, which discouraged real estate investment; and aggressive construction eventually caused supply to meet and outstrip demand. See App. at 39.

4

security that `things would probably work out and substantial losses would be avoided.' " App. at 39.

Economic conditions did not improve. By August 1991, Funds I and II had stopped paying quarterly distributions. In April 1992, Kidder informed investors that conditions were unlikely to rebound, and therefore it was initiating an "exit strategy." App. at 40. By 1994, all three funds had announced their intention to liquidate, which they accomplished between February and November of 1997.

## II. PROCEDURAL HISTORY

John W. Mathews invested $20,000 in Fund II in 1984. He allegedly relied primarily upon oral representations by a Kidder broker. As the fund's value deteriorated, Mathews became understandably frustrated and disappointed. On January 23, 1995, he filed a class action complaint contending that Kidder had intentionally misrepresented the inherent risks associated with the funds and therefore had fraudulently induced him and others to invest. He claimed that Kidder had engaged in a pattern of racketeering activity prohibited by the federal RICO statute, 18 U.S.C. SS 1961 et seq.. Specifically, he claimed that Kidder had committed the predicate acts of securities fraud, mail fraud, and wire fraud.[4]

In response, Kidder filed a motion to dismiss. It claimed that: (1) Mathews lacked standing to assert claims involving Funds I and III because he had only invested in Fund II, (2) Mathews had failed to allege the necessary RICO elements, and (3) his claims were barred by RICO's four-year statute of limitations. The District Court denied the motion without prejudice. The court agreed that Mathews lacked standing concerning Funds I and III, but held that he could pursue his claims relating to Fund II. As to Kidder's remaining objections, the court allowed the case to move forward to develop a more complete record.

Both parties quickly filed additional motions. Mathews sought to amend his complaint to include plaintiffs who

───────────────────────────────────────────────

4. He also asserted a number of claims under state law, including breach of fiduciary duty and negligent misrepresentation.

5

had invested in Funds I and III. Ultimately, he moved for class certification, including investors in all three funds. Kidder opposed Mathews' requests on procedural grounds, and in addition, argued that the Private Securities Litigation Reform Act of 1995 ("PSLRA") barred Mathews' RICO action. The PSLRA, which Congress enacted on December 22, 1995, amended the federal RICO statute and explicitly eliminated securities fraud as a predicate act. See Pub. L. No. 104-67, S 107, 109 Stat. 737, 758 (1995), amending 18 U.S.C. S 1964(c) (1994).

The District Court held that the PSLRA did not bar Mathews' RICO claim. See Mathews v. Kidder Peabody & Co., Inc., 947 F.Supp. 180 (W.D. Pa. 1996). In addition, the court allowed Mathews to amend his complaint to include investors in Funds I and III, and it certified his requested class. Kidder filed an interlocutory appeal to this Court arguing that the PSLRA should apply retroactively to suits pending when the Act was passed. We rejected that claim. See Mathews v. Kidder Peabody & Co., Inc., 161 F.3d 156, 170-71 (3d Cir. 1998) ("[W]e are extremely reluctant to create causes of action that did not previously exist, or -- as in this case -- to destroy causes of action and remedies that clearly did exist before Congress acted.").

Discovery continued until November 1999. Kidder then moved for summary judgment, or alternatively to decertify the plaintiff class. Mathews opposed these motions, and once again, sought to amend the complaint. In particular, he wanted to add a new allegation claiming that the Kidder prospectus itself was fraudulent, because it misrepresented the inherent risks of the investment. The District Court denied Mathews' motion to amend. The court cited "undue prejudice to Defendants, undue delay on the part of the Movant, the Movant's repeated failure to cure deficiencies by previous amendments and futility of amendment." App. at 29. It held that amending the complaint would unduly prejudice the defendants because it "would necessitate the taking of significant additional discovery and the difficulties that would entail is persuasive." App. at 29. Mathews filed a motion for reconsideration, which was denied.

On August 18, 2000, the District Court issued a thoughtful and thorough seventy-four page opinion and

order granting Kidder's motion for summary judgment. See App. at 33-106. The court held that Mathews' claims were barred by the applicable four-year statute of limitations. Statute of limitations issues surrounding RICO claims historically have been tricky for two reasons. First, Congress failed to provide a statutory limitations period in the RICO statute itself, and second, the Supreme Court has consistently refused to determine when a RICO action accrues -- i.e., when the applicable limitations period begins to run. It is now well settled that RICO actions enjoy a four-year limitations period; the question of accrual, however, remains a source of controversy.

In this case, the District Court applied what it termed an "injury discovery and pattern rule," see App. at 57-61, under which the statute begins to run once "all of the elements of a civil RICO cause of action existed, whether or not discovered, and the plaintiffs knew [or should have known] of the existence and source of their injury." App. at 60 (quoting Poling v. Hovanian Enters., 99 F.Supp.2d 502, 511 (D.N.J. 2000)). The court assumed, for the sake of summary judgment, that Mathews' claims had merit and that Kidder had committed securities, wire, and mail fraud. Nonetheless, it had to address two questions: When did the elements of a RICO claim exist, and when did the Appellants know, or should they have known, of their injuries?

First, the court held that "all the elements of Plaintiffs' RICO claim and their injury were in place no later than May 1986."5 App. at 77. Second, the court reviewed the mix of information available to the Appellants and concluded that they should have been aware of their injury"no later than February 1990." App. at 90. Thus, because both prongs of the "injury discovery and pattern rule" were satisfied, the statute of limitations began to run in early

_____

5. Assuming that Kidder committed the alleged offenses, the court concluded that the elements of securities fraud"were probably finalized by May 1986 . . . but certainly no later than December 1986," App. at 68; mail fraud "occurred no later than May 1986," App. at 72, and interstate wire fraud "occurred in the early 1980s and certainly no later than March 1985." App. at 73.

7

1990. Mathews did not file his claim until almost five years later. Therefore, he was barred by RICO's four-year limitations period. The court also rejected Mathews' argument that the limitations period should be equitably tolled by Kidder's fraudulent acts and misrepresentations. Once again, the court assumed that Mathews' allegations were true, but nonetheless concluded that the Appellants had not exercised "reasonable diligence" and therefore could not benefit from equitable tolling.6  Mathews filed a timely appeal.

## III. Accrual Rule

The statute of limitations for civil RICO claims has engendered a great deal of controversy. The statute itself does not contain a limitations period. See Rotella v. Wood, 528 U.S. 549, 552, 120 S.Ct. 1075, 1079-80 (2000). As a result, in Agency Holding Corp. v. Malley-Duff & Assocs., 483 U.S. 143, 107 S.Ct. 2759 (1987), the Supreme Court relied upon the Clayton Act and adopted an analogous four-year period. However, the Court did not specify when the period began, and three different interpretations arose.

A number of Courts of Appeals adopted the "injury discovery accrual rule," which began the four-year period once "a plaintiff knew or should have known of his injury." Rotella, 528 U.S. at 553, 120 S.Ct. at 1080. This approach did not require any knowledge of the other RICO elements. All but one of the remaining Courts adopted the"injury and pattern discovery rule . . . under which a civil RICO claim accrues only when the claimant discovers, or should discover, both an injury and a pattern of RICO activity." Id. We alone adopted a third variant, the "last predicate act" rule. See Keystone Ins. Co., 863 F.2d 1125 (3d Cir. 1988). From a plaintiff 's perspective, this was the most lenient approach: "Under this rule, the period began to run as soon

_____

6. After dismissing Mathews' federal claims, the District Court declined to exercise supplemental jurisdiction over the remaining state law claims. See App. 104 ("In a case such as this, where all the federal claims brought under the RICO statue have been dismissed, there is little to gain in the way of convenience or judicial economy in having this
court hear a case now consisting entirely of state claims.").

as the plaintiff knew or should have known of the injury and the pattern of racketeering activity, but began to run anew upon each predicate act forming part of the same pattern." Rotella, 528 U.S. at 554, 120 S.Ct. at 1080.

In 1997, the Supreme Court "cut the possibilities by one," rejecting our last predicate act rule. Id. (discussing Klehr v. A.O. Smith Corp., 521 U.S. 179, 117 S.Ct. 1984 (1997)). The Court based its holding on two arguments: (1) the rule created a limitations period "longer than Congress could have contemplated," which conflicted "with a basic objective -- repose -- that underlies limitations periods," and (2) it conflicted with the "ordinary Clayton Act rule" applicable in private antitrust actions. Klehr , 521 U.S. at 187-88, 117 S.Ct. at 1989-90. In 2000, the Court again narrowed the possible approaches by rejecting the injury and pattern discovery rule. See Rotella, 528 U.S. at 555-559, 120 S.Ct. at 1080-83. The Court stressed the"basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff 's opportunity for recovery and a defendant's potential liability." Id. at 555, 120 S.Ct. at 1081. In addition, the Court noted that the injury discovery rule would encourage plaintiffs to investigate their claims earlier and with greater vigor. See id. at 557, 120 S.Ct. at 1082. (noting that the object of civil RICO is "not merely to compensate victims but to turn them into prosecutors, `private attorneys general,' dedicated to eliminating racketeering activity").

In the wake of Rotella, at least two accrual rules remain possible: an injury discovery rule, where the limitations period begins to run once a plaintiff discovers her injury, or an injury occurrence rule, where discovery is irrelevant. See Rotella, 528 U.S. at 554 n.2, 120 S.Ct. at 1080 n.2 (refusing to "settle upon a final rule"). In Forbes v. Eagleson, we recently considered these two approaches and adopted the injury discovery rule. 228 F.3d 471, 484 (3d Cir. 2000) ("[A] discovery rule applies whenever a federal statute of limitation is silent on the issue."); see also Rotella, 528 U.S. at 555, 120 S.Ct. at 1081 ("Federal courts,

9

to be sure, generally apply a discovery accrual rule when a statute is silent on the issue, as civil RICO is here.").7

IV. Zenith Radio

The Appellants contend that an exception to the standard RICO accrual rule applies in this case. They claim that the damages resulting from Kidder's misconduct were unclear at the time they invested, and "a cause of action does not accrue until the fact of financial loss becomes predictable, concrete and non-speculative and damages are provable." Appellants' Br. at 32. Thus, they argue that their claims did not accrue until Kidder indicated, in 1993 and 1994, that the investment funds were unlikely to be profitable. See Appellants' Br. at 31.

The Appellants rely heavily upon Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338-42, 91 S.Ct. 795, 806-08 (1971),8 a case involving alleged antitrust

_____

7. The District Court's decision, which preceded our ruling in Forbes by approximately two months, applied an "injury discovery and pattern rule." App. at 60. Under this formulation, a RICO claim does not accrue until a plaintiff discovers he has been injured and all of the elements of his RICO claim, including a pattern of racketeering activity, exist. The District Court's test, therefore, poses an important question -- whether a civil RICO claim must be complete before it accrues. The Supreme Court expressly declined to provide an answer in Rotella, 528 U.S. at 558 n.4, 120 S.Ct. at 1082 n.4, and we too have been silent on the issue. See Forbes, 228 F.3d at 484 (addressing only the question of injury discovery because a pattern of racketeering activity was well established). We have little doubt that the question eventually will have to be addressed. However, its resolution is not necessary to the outcome of this case, because the Appellants have not contested, on appeal, the existence of a pattern of racketeering activity. Therefore, we leave the issue for another day.

8. As Kidder recognizes in its brief, Zenith Radio concerned an antitrust violation. Under the Clayton Act, "a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff 's business." Zenith Radio, 401 U.S. at 338, 91 S.Ct. at 806. Thus, antitrust claims are subject to the less plaintiff-friendly "injury occurrence" accrual rule. Because we hold that RICO claims are governed by a more lenient "injury discovery" rule, it is unclear whether we need to adopt the Zenith Radio exception (delaying the accrual of claims when damages are merely speculative) in the RICO context. For the sake of discussion, however, we will assume without deciding that the Zenith Radio exception could apply to RICO claims.

10

violations. In Zenith Radio, the defendant raised a statute of limitations defense, and argued that many of the purported injuries arose from conduct that occurred more than four years before the plaintiff filed suit. The Supreme Court rejected the defendant's argument. The Court held that at the time of the original misconduct, future damages were speculative and unclear and therefore unrecoverable. See id. at 339, 91 S.Ct. at 806. The Court noted that it would be "contrary to congressional purpose[s]" to foreclose recovery of those damages. It held that:

> [R]efusal to award future profits as too speculative is equivalent to holding that no cause of action has yet accrued for any but those damages already suffered. In these instances, the cause of action for future damages, if they ever occur, will accrue only on the date they are suffered; thereafter the plaintiff may sue to recover them at any time within four years from the date they were inflicted.

401 U.S. at 339, 91 S.Ct. at 806. The Appellants argue that this case is factually similar to Zenith Radio , and that RICO damages were merely speculative at the time of their investment. For support, they cite a list of cases from the Second Circuit Court of Appeals and our recent decision in Maio v. Aetna, Inc., 221 F.3d 472 (3d Cir. 2000).9

The District Court rejected the proposition that the Appellants were injured when "their investments resulted in a `catastrophic loss,' that is, loss of capital gains from appreciation of the properties when they were sold." App. at

_____

9. In Maio, we held that a plaintiff lacks standing to bring a RICO claim unless he has suffered a concrete financial loss. See Maio v. Aetna, Inc., 221 F.3d 472 (3d Cir. 2000). Plaintiffs sued their HMO claiming that they had received an "inferior health care" product. They alleged neither a denial of medical benefits nor inferior treatment. Instead, their claim rested solely upon Aetna's misrepresentation, which allegedly caused them to pay too much in premiums. We rejected the plaintiffs' theory. Although we recognized that the diminution in value of tangible property, "like a plot of land or diamond necklace," can constitute a RICO injury, the plaintiffs' interest was merely a contractual right. 221 F.3d at 488–89. In that context, a RICO injury requires "proof that Aetna failed to perform under the parties' contractual arrangement." Id. at 490.

11

Instead, the court ruled that the underlying claim was for securities fraud, and in such cases, an injury occurs when an investor purchases overpriced securities. See App. at 66, 75 ("[I]t is well established that securities fraud in the sale of limited partnership interests occurs when the partnership interests are sold.") (citing Volk v. D.A. Davidson & Co., 816 F.2d 1406, 1412 (9th Cir. 1987)). The court, however, did not explicitly address Zenith Radio.[10] Nonetheless, we agree with the District Court's conclusion and find the Appellants' reliance upon Zenith Radio misplaced.

The value of a security is related to its expected return and its inherent risk. All else being equal, the greater the expected return and the lower the risk, the more valuable the security. If we accept the Appellants' allegations as true, Kidder overstated the expected return of the funds and downplayed their inherent risks. Thus, Kidder's misrepresentations exaggerated the value of the funds and led the Appellants to purchase overpriced securities. We therefore conclude that the Appellants sustained an injury when they purchased units in Kidder's investment funds -- the only question is whether their damages, at the time of their investment, were sufficiently concrete.

We answer in the affirmative for three reasons. First, we agree with Kidder that the actual value of the securities was readily calculable at the time of the Appellants' investment. See Appellant's Br. at 27 ("While this determination may require some calculation or even expert testimony, the measure of damages is not speculative."). The raison d'etre of many investment banks and financial institutions is to calculate the value of complicated securities, many of which are far more complex than the funds at issue here. Certainly, district courts are no strangers to expert testimony concerning financial valuation. See, e.g., Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 297 (3d Cir. 1991) ("[D]amages are most commonly calculated as the difference between the price paid for a security and the security's

_____

10. The court cited Zenith Radio only once, noting that courts apply a pure injury occurrence accrual rule for Clayton Act antitrust violations. See App. at 49 n.12.

12

`true value.' "). In this case, as Kidder contends, "the Funds could have been valued at any time based, in part, on the yearly valuations of these properties." Appellant's Br. at 27. The Appellants' damages, at the time they invested, were simply the difference between the approximate value of the Funds, calculated based upon market information free of Kidder's misrepresentations, and the actual purchase price.

Second, we agree with the reasoning employed by the only other Circuit Court of Appeals to have addressed this issue. In a remarkably similar factual setting, the Second Circuit Court of Appeals held that investors were injured when they purchased overpriced limited partnership units based upon the defendant's fraudulent misrepresentations. See In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d 56, 59 (2d Cir. 1998). Before the Merrill Lynch decision, a number of Second Circuit cases had suggested that a RICO injury did not occur at the time of investment. [11] The District Court in Merrill Lynch summarized those cases as follows:

> [They stand] for the proposition that when a creditor has been defrauded, but contractual or other legal remedies remain which hold out a `real possibility' that the debt, and therefore the injury, may be eliminated, RICO injury is speculative, and a RICO claim is not ripe until those remedies are exhausted.

In re Merrill Lynch Ltd. P'ships Litig., 7 F.Supp.2d 256, 263 (S.D.N.Y. 1997). Nonetheless, the court drew a critical distinction between cases involving contractual debt instruments and those involving "equity investments with no basis for recovery other than the limited partnerships' performance." Id. Traditionally, the line between debt and equity has been well defined.[12] Debt contracts promise set

_____

11. See First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 767–68 (2d Cir. 1994) (holding that a RICO injury does not occur until a debt becomes uncollectible and the note holder exhausts his contractual remedies); Cruden v. Bank of New York, 957 F.2d 961, 977–78 (2d Cir. 1992) (holding that a RICO injury does not occur until a debtor defaults on promised principal and equity payments); Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1103 (2d Cir. 1988) (holding that a RICO injury does not occur until it becomes clear that a loan will not be repaid).

12. We recognize that modern financial markets, and the widespread use of complicated derivative instruments, have blurred the once-sharp

13

future payments of interest and principal. Upon default, an investor can recover damages through a contract action. In contrast, an equity investment is traditionally considered an ownership stake in an underlying asset. There is no promised return; therefore, an investor has no contractual remedy if the underlying property, asset, or venture fails.

The District Court in Merrill Lynch recognized that in the debt context, a RICO injury occurs only when a debtor defaults on his contractual obligation. 7 F.Supp.2d at 263. Only at that point can an investor be sure that he will not receive the benefit of his bargain. We implicitly recognized the same principle in Maio v. Aetna, Inc., 221 F.3d 472 (3d Cir. 2000). In that case, the plaintiffs claimed that Aetna's fraudulent misrepresentations had led them to buy overpriced health insurance. We held, however, that a RICO injury did not occur until Aetna failed to perform its contractual obligations -- i.e., until it failed to provide health benefits or treatment that it had promised. 221 F.3d at 488-90. In essence, we characterized the plaintiffs' property interest as a contractual right to receive certain benefits, and distinguished it from an ownership interest in tangible property. See id. at 489-90 ("[T]he property rights at issue are different from interests in real or personal property.").

In contrast, the Appellants' interest in this case was an ownership stake in real property, fundamentally no different than "a plot of land or a diamond necklace." Maio, 221 F.3d at 488. Although Kidder may have been overly optimistic in describing its investment funds, it never

_____

distinction between debt and equity. See Anthony P. Polito, Useful Fictions: Debt and Equity Classification in Corporate Tax Law, 30 Ariz. St.
L.J. 761, 790 (1998) ("[F]inance theory cannot identify the true boundary between debt and equity."). Today, debt contracts are openly traded, are valued from moment to moment, and often behave like equity, especially when a company experiences financial difficulty. Thus, any legal test dependent upon a bright-line distinction between contractual debt and equity ownership is at best precarious. However, both the Second Circuit, and possibly the Supreme Court, have apparently adopted this distinction. Luckily, because this case concerns a clear equity interest in
real property, we need not explore this potential minefield any further.

14

promised a set return. Therefore, the Appellants have no contractual remedy for the losses they incurred. Instead, Kidder offered an equity investment, contingent upon the appreciation, or lack thereof, of the underlying Sunbelt properties. The crux of the Appellants' claim is that they overpaid for that interest. We believe that the most accurate way to measure that loss, like for any other tangible property interest, would be to calculate the difference between what the Appellants paid and the true market value of what they received. Therefore, we agree with the Second Circuit Court of Appeals that this case is distinguishable from those involving contractual agreements, such as debt contracts. When a defendant fraudulently misleads individuals into purchasing equity interests in real property, an injury occurs at the time of investment.

Finally, caselaw concerning U.S. securities regulations also supports our conclusion. The Appellants argue that their losses did not become sufficiently concrete until Kidder decided to liquidate the funds in 1993. They presumably believe that the only non-speculative way to determine damages would be to calculate the difference between what they originally paid for the fund units and what they received upon liquidation. In other words, they believe rescission is the only proper approach. See Pinter v. Dahl, 486 U.S. 622, 641 n.18, 108 S.Ct. 2063, 2076 n.18 (1988) ("[R]escission [provides] for restoration of the status quo by requiring the buyer to return what he received from the seller;" in terms of damages, rescission provides "the consideration paid for such security with interest thereon, less the amount of any income received thereon."). Of course, we need not determine the best method for calculating damages in the present case. Our task is merely to decide whether the Appellants' damages could have been calculated at the time of their injury. If an "out of pocket measure" of damages (the difference between the purchase price of a security and its true value) is viable in this case, we must conclude that the Appellants' injury, at the time of their investment, was sufficiently concrete.

The Appellants have alleged securities fraud under S 12(2) of the Securities Exchange Act of 1933. See 15

U.S.C. S 77I, App. at 38. Section 12(2) specifically provides for rescissionary damages. See Bally v. Legg Mason Wood Walker, Inc., 925 F.2d 682, 693 (3d Cir. 1991). However, the Appellants also cite S 10(b) of the Securities Exchange Act of 1934. See 15 U.S.C. S 78j(b), App. at 38. Damages in S 10(b) securities fraud cases "are most commonly calculated as the difference between the price paid for a security and the security's `true value.' " Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 297 (3d Cir. 1991). Although we have declined to establish a firm rule for calculating S 10(b) damages, see Scattergood v. Perelman, 945 F.2d 618, 624 n.2 (3d Cir. 1991), the Fifth Circuit Court of Appeals has commented at length about the conceptual shortcomings of rescission:

> [T]he rescissional measure permits the defrauded securities buyer to place upon the defendant the burden of any decline in the value of the securities between the date of purchase and the date of sale even though only a portion of that decline may have been proximately caused by the defendant's wrong. . . . Under these circumstances, the rescissional measure is unjust insofar as it compensates an investor for the nonspecific risks which he assumes by entering the market. Losses thus accruing have no relation to either the benefits derived by the defendants from the fraud or to the blameworthiness of their conduct.

Huddleston v. Herman & MacClean, 640 F.2d 534, 555 (5th Cir. 1981), modified on other grounds, 459 U.S. 375, 103 S.Ct. 683 (1983). We have expressed similar sentiments. See Hoxworth v. Blinder, Robinson & Co., Inc., 903 F.2d 186, 203 n.25 (3d Cir. 1990) ("Although the Supreme Court has reserved the question whether a rescissionary measure of damages is ever appropriate for defrauded buyers under rule 10b-5, this court has expressed clear disapproval of a damage theory that would insure defrauded buyers against downside market risk unrelated to the fraud.").

Thus, in most S 10(b) cases, we are extremely hesitant to award rescissionary damages and instead apply an"out of pocket measure." In this case, there is nothing in the record to suggest that the Appellants' injuries were any more speculative or difficult to calculate than those in a

16

typical S 10(b) claim. Therefore, we reject the Appellants' argument that their claims require a rescissionary measure of damages. Instead, we conclude that the Appellants' damages, at the time they purchased units in Kidder's investment funds, could have been calculated by an"out of pocket measure" and thus were sufficiently concrete and non-speculative.

## V. Injury Discovery

The Appellants' second primary objection is that the District Court erred by holding that they should have discovered their injury "no later than February 1990." App. at 90. Because the court granted summary judgment, the burden of proof is initially on Kidder to demonstrate the absence of a genuine issue of material fact surrounding the Appellants' discovery of their injury. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-24, 106 S.Ct. 2548, 2552-53 (1986). We recognize that this puts Kidder in the unenviable position of arguing that its fraud was so obvious that the Appellants should have discovered their injuries. In addition, the issue is extremely fact-specific. See Davis v. Grusemeyer, 996 F.2d 617, 623 n.10 (3d Cir. 1993) ("[T]he applicability of the statute of limitations usually implicates factual questions as to when plaintiff discovered or should have discovered the elements of the cause of action; accordingly, `defendants bear a heavy burden in seeking to establish as a matter of law that the challenged claims are barred.' ") (quoting Van Buskirk v. Carey Canadian Mines, Ltd., 760 F.2d 481, 498 (3d Cir. 1985)). Therefore, Kidder's task is not an easy one.13

_____

13. It is not, however, impossible. We quickly reject any suggestion by the Appellants that summary judgment can never be granted when the issue of injury discovery is contested by the parties. Instead, we agree that "[i]f the facts needed in order to determine when `a reasonable investor of ordinary intelligence' discovered or should have discovered the fraud can be gleaned from the pleadings, a court may resolve the issue of the existence of fraud at the summary judgment stage." App. at 78. Thus, at least in the RICO context, we disagree with the Eleventh Circuit Court of Appeals, which has held that "as a general rule, the issue of when a plaintiff in the exercise of due diligence should have known of the basis for his claims is not an appropriate question for summary judgment." Morton's Market, Inc. v. Gustafson's Dairy, Inc., 198 F.3d 823, 832 (11th Cir. 1999).

17

In Forbes, we adopted an "injury discovery rule" whereby a RICO claim accrues when "plaintiffs knew or should have known of their injury." 228 F.3d at 484. By our own plain language, the rule is both subjective and objective. The subjective component needs little explanation -- a claim accrues no later than when the plaintiffs themselves discover their injuries. However, we offered little insight into the objective prong of the Forbes test. We take this opportunity to do so.

In order to determine whether the Appellants were on "inquiry notice" of their injuries, the District Court relied heavily upon caselaw in other Circuits concerning securities fraud. Without a doubt, the Appellants' claim is greatly dependent upon their allegations of securities fraud. However, it is important to note that "[t]he focus of accrual in a RICO action is different from that for a fraud claim where the focus is on the acts of the defendants." Landy v. Mitchell Petroleum Tech. Corp., 734 F.Supp. 608, 625 (S.D.N.Y. 1990). More specifically, a RICO claim accrues when the plaintiffs should have discovered their injuries. In contrast, a securities fraud claim accrues when the plaintiffs should have discovered the misrepresentations and wrong-doing of the defendants. The difference is subtle, but in some circumstances, it can be dispositive. 14 In this case, however, it is insignificant because the fraud and injury occurred at approximately the same time -- when the Appellants purchased Kidder's securities. Furthermore, in most securities fraud actions, the plaintiffs' injuries are inextricably intertwined with the defendant's misrepresentations. Discovery of one leads almost immediately to discovery of the other. Therefore, we believe that the District Court did not err by relying upon securities fraud precedent to determine whether the Appellants were on "inquiry notice" of their injuries.

It would be an understatement to characterize the body of caselaw concerning what constitutes "inquiry notice" in
_____

14. In Landy, 734 F.Supp. at 625, the District Court held that the defendant's fraud occurred approximately three years before the plaintiffs were injured. Thus, the plaintiffs' securities fraud claim accrued three years before their RICO action accrued.

18

a federal securities fraud action as extensive. See, e.g., Lawrence Kaplan, Annotation, What Constitutes"Inquiry Notice" Sufficient to Commence Running of Statute of Limitations in Securities Fraud Action -- Post-Lampf Cases, 148 A.L.R. Fed. 629 (1998). The general articulation of the inquiry notice standard, however, is fairly consistent.15 In the context of a RICO action predicated upon a securities fraud claim, we hold that a plaintiff is on inquiry notice whenever circumstances exist that would lead a reasonable investor of ordinary intelligence, through the exercise of reasonable due diligence, to discover his or her injury.

Some courts have further refined the inquiry notice test into a multi-step analysis. See, e.g., Havenick v. Network Express, 981 F.Supp. 480 (E.D. Mich. 1997); Addeo v. Braver, 956 F.Supp. 443 (S.D.N.Y. 1997). The District Court in this case applied a two-part test: "(1) whether the plaintiffs knew or should have known of the possibility of fraud (`storm warnings') and, once that possibility arose, (2) whether plaintiffs exercised due diligence to determine the origin and extent of the fraud. The first part of the test is objective, the second subjective." App. at 80 (citations omitted). In other words, the court asked whether there were sufficient storm warnings on the horizon, and if so, whether the Appellants exercised due diligence to recognize them.

_____

15. See Great Rivers Coop. of Southeastern Iowa v. Farmland Indus., Inc., 120 F.3d 893, 896 (8th Cir. 1997) ("[I]nquiry notice exists when there are `storm warnings' that would alert a reasonable person of the possibility of misleading information, relayed either by an act or by omission."); Gray v. First Winthrop Corp., 82 F.3d 877, 881 (9th Cir. 1996) ("[I]f a prudent person would have become suspicious from the knowledge obtained through the initial prudent inquiry and would have investigated further, a plaintiff will be deemed to have knowledge of facts which would have been disclosed in a more extensive investigation."); Dodds v. Cigna Sec., Inc., 12 F.3d 346, 350 (2d Cir. 1993) (Plaintiff is on inquiry notice "when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud."); Caviness v. Derand Res. Corp., 983 F.2d 1295, 1303 (4th Cir. 1993) (Inquiry notice exists when plaintiff "has such knowledge as would put a reasonably prudent purchaser on notice to inquire, so long as that inquiry would reveal the facts on which a claim is ultimately based.").

We hold that inquiry notice should be analyzed in two steps. First, the burden is on the defendant to show the existence of "storm warnings." As the District Court noted, storm warnings may take numerous forms, and we will not attempt to provide an exhaustive list. They may include, however, "substantial conflicts between oral representations of the brokers and the text of the prospectus, . . . the accumulation of information over a period of time that conflicts with representations that were made when the securities were originally purchased," or "any financial, legal or other data that would alert a reasonable person to the probability that misleading statements or significant omissions had been made." App. at 80–81.

The existence of storm warnings is a totally objective inquiry. Plaintiffs need not be aware of the suspicious circumstances or understand their import. It is enough that a reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning. Thus, investors are presumed to have read prospectuses, quarterly reports, and other information relating to their investments. This comports with the general purpose of civil RICO to encourage plaintiffs to actively investigate potential criminal activity, to become "prosecutors, `private attorneys general,' dedicated to eliminating racketeering activity." Rotella , 528 U.S. at 557, 120 S.Ct. at 1082.

Second, if the defendants establish the existence of storm warnings, the burden shifts to the plaintiffs to show that they exercised reasonable due diligence and yet were unable to discover their injuries. This inquiry is both subjective and objective. The plaintiffs must first show that they investigated the suspicious circumstances. 16 Then, we must determine whether their efforts were adequate–– i.e., whether they exercised the due diligence expected of

_____

16. We are reluctant to excuse Appellants' lack of inquiry because, in retrospect, reasonable diligence would not have uncovered their injury. Such a holding would, in effect, discourage investigation of potential racketeering activity. See Rotella, 528 U.S. at 557, 120 S.Ct. at 1082. Therefore, if storm warnings existed, and the Appellants chose not to investigate, we will deem them on inquiry notice of their claims.

reasonable investors of ordinary intelligence. Because the stated goal of civil RICO is to encourage active investigation of potential racketeering activity, see Rotella , 528 U.S. at 557, 120 S.Ct. at 1082, we reject the proposition that unsophisticated investors should be held to a lower standard of due diligence.

In this case, the District Court found that Kidder had established the existence of storm warnings. In particular, our review of the record, in addition to the District Court's findings, indicates four areas of potential concern-- the initial prospectus, the "paltry" annual distributions of rental income, the falling net asset value of each partnership unit, and Kidder's periodic assessment of the funds' economic health. While it is true that the "mix of information" may constitute a storm warning in the aggregate, we will address the prospectus and the subsequent financial updates separately.

We begin with the prospectus. The District Court focused much of its attention upon the descriptions of risks provided in the prospectus. See App. at 49-53; 2443-2525. We do not dispute that the language cited by the court is present, or that "the specific risks discussed in the [prospectus] are most of the events on which Plaintiffs base their allegations of fraud." App. at 82. Nonetheless, we agree with the spirit of the Appellants' position, that there is nothing in the document to suggest the magnitude of the many enumerated risks. In fact, in reading through the numerous cautionary provisions, we are reminded of the laundry lists of possible side-effects that accompany most prescription medications. Just because there are risks, even if they are numerous, does not mean that a drug is unsafe. Similarly, there is nothing in the prospectus to suggest that the funds are especially risky or inappropriate for conservative investors.17

Like the Seventh Circuit Court of Appeals, we are mindful of the dangers in adopting too broad an interpretation of

_____

17. We agree with the District Court, however, that a reasonable investor of ordinary intelligence would have read the prospectus. Therefore, we reject any argument based upon the Appellants' ignorance of its contents.

21

inquiry notice. See Law v. Medco Research, Inc. , 113 F.3d 781, 786 (7th Cir. 1997) ("[T]oo much emphasis on the statute of limitations can precipitate premature and groundless suits, as plaintiffs rush to beat the deadline without being able to obtain good evidence of fraud"); Fujisawa Pharm. Co., Ltd. v. Kapoor, 115 F.3d 1332, 1335 (7th Cir. 1997) ("Inquiry notice . . . must not be construed so broadly that the statute of limitations starts running too soon for the victim of the fraud to be able to bring suit."). If a relatively generic enumeration of possible risks, without any meaningful discussion of their magnitude, can be enough to establish inquiry notice at the summary judgment stage, we would encourage a flood of untimely litigation. Therefore, we hold that the prospectus, by itself, does not constitute a storm warning.

Kidder's numerous financial updates, however, are a different matter.18 Based upon the correspondence concerning Funds I and II, we conclude that the District Court, if anything, was overly generous to the Appellants in holding that they should have discovered their injuries by early 1990. Sufficient storm warnings existed for investors in Funds I and II no later than April of 1989. On August 18, 1988, Kidder informed investors in Fund I that their quarterly distribution had fallen to $3.00 per unit. 19 This represented over a 66% decrease in the initial fund distributions, which ranged from $9.07 (Q3, 1983) to $9.40 (Q1, 1985). On that same date, Kidder informed investors in Fund II that their quarterly distributions had fallen to $1.50 per unit. This represented over a 75% decrease in the initial fund distributions, which ranged from $6.00 (Q2,

_____

18. Because reasonable investors of ordinary intelligence read correspondence describing the economic health of their investments, we presume that the Appellants read the documents that Kidder sent them.

19. There are implications in both the parties' briefs and the District Court's opinion that the total amount of distributions was "paltry" or excessively low. We find this argument puzzling. A $9.00 quarterly distribution, if consistent, would result in an approximate annual yield of 7.2% ($36.00 per $500 unit). This rate of return is generally consistent with a conservative, low risk investment vehicle. Contrary to the suggestions of the parties, a higher return would arouse suspicion that the securities were actually high-risk, speculative investments.

1985) to $7.00 (Q4, 1986). Even if the distributions had returned to their original levels at some later time, this sort of volatility is simply inconsistent with a conservative investment vehicle similar to municipal bonds.

Furthermore, Kidder also sent the Appellants annual updates on the total net asset value of the individual units.[20] As of December 31, 1985, Fund I units had a total net asset value of $532. On April 8, 1989, Kidder sent a letter to Fund I investors indicating that total net asset value had fallen to $337. See App. at 1204. This represented a 36% decrease from 1985. As of December 31, 1985, Fund II units had a total net asset value of $509. On April 8, 1989, Kidder sent a letter to Fund II investors indicating that total net asset value had fallen to $351. See App. at 1872. This represented a 31% decrease from 1985.

The Appellants' only response is that "there was ample evidence from which a jury could conclude that it was entirely reasonable for [them] to wait and see how things developed." Appellants' Br. at 40. The Appellants fundamentally misunderstand their own argument. They contend that Kidder fraudulently misrepresented the inherent risk of the investment funds. According to modern finance, risk is best understood as a security's volatility. Therefore, regardless of whether the funds recovered, the large swings in their distributions and net asset values are inconsistent with low-risk, conservative investments.[21] After the funds' net asset values fell over 30% and their distributions fell by over 60%, the Appellants should have recognized that they were not the safe, conservative vehicles

_____

20. We agree with the District Court that these values were, at the very least, "a good indicator . . . of [the fund units'] market value." App. at 86.

21. Even if the Appellants' argument was on-point, courts have consistently discouraged a "wait and see" strategy. For example, in Tregenza v. Great Am. Communications Co., 12 F.3d 717, 722 (7th Cir. 1993), "plaintiffs waited patiently to sue. If the stock rebounded from the cellar they would have investment profits, and if it stayed in the cellar they would have legal damages. Heads I win, tails you lose." The court held that the plaintiffs were on inquiry notice. See also Sterlin v. Biomune Sys., 154 F.3d 1191, 1202 (10th Cir. 1998) ("The purpose behind commencing the . . . limitations period upon inquiry notice is to discourage investors from adopting a wait-and-see approach.").

23

promised by Kidder. Based upon the financial information received by the Appellants, we have no problem concluding that ominous storm warnings, concerning Funds I and II, were present no later than April 1989.

As the Appellants point out, however, Fund III is a closer question. By April of 1990, the Fund's net asset value had fallen only 14%, see App. at 2629, and its distributions were still consistent. See App. at 2947-48. In fact, a noticeable decrease in the Fund's distributions did not occur until the first quarter of 1992, and the Appellants were not informed until May 15, 1992. See App. at 981. Even when viewed in combination with Kidder's prospectus and the cautionary language in its quarterly updates, we would be hard-pressed to find no genuine issue of material fact as to whether Fund III investors were on inquiry notice of their injuries prior to 1992. However, the Appellants did not allege a separate cause of action based solely upon Fund III. Instead, they sought and were granted certification of a class that included investors in all three funds, and they alleged a common, overarching pattern of racketeering activity. See Mathews v. Kidder Peabody & Co., No 95-85, 1996 WL 665729, at *4 (W.D. Pa. Sept. 26, 1996) ("Plaintiffs have alleged a large, unitary scheme, a common course of conduct."). As we previously concluded, the storm warnings pertaining to Funds I and II were overwhelming. Thus, we conclude that sufficient storm warnings existed for the entire class certified by the Appellants.

Because storm warnings were present, we must next determine whether the Appellants exercised due diligence expected of reasonable investors of ordinary intelligence. We conclude that they did not. Based upon the record, the parties' briefs, and the District Court's opinion, the only action that might be termed due diligence is a single letter from Attorney Robert Wolf inquiring into the status of Fund I.22  See App. at 68-69. According to the District Court,

_____

22. According to the District Court's opinion, a small number of plaintiffs
testified as to having asked their brokers about the status of their investment, but they quickly "dropped the matter" after being assured that everything was all right. See App. at 69-70 & n.62. A few cursory inquiries cannot amount to reasonable due diligence.

24

Kidder responded with a four and one-half page letter, reiterating financial information provided in quarterly reports. The only positive sentiment in the letter was Kidder's statement that the General Partners "remain confident in the underlying value of the Partnership's real estate assets and believe this value will be realized once these markets turnaround." App. at 101 n.61. There is no evidence that Wolf followed-up in any fashion. We agree with the District Court that if anything, this evidences a lack of due diligence.

Furthermore, to determine what constitutes "reasonable" due diligence, we must consider the magnitude of the existing storm warnings. The more ominous the warnings, the more extensive the expected inquiry. In this case, the warnings, at least for investors in Fund I and II, were massive and extremely threatening. For "conservative first-time investors," they must have appeared like funnel clouds. That none of them pressed Kidder for an explanation defies comprehension.

This case stands in stark contrast to Forbes, 228 F.3d at 479, where the plaintiffs hired an investigator, who made numerous inquiries and requested financial documents not only from the defendant, but also from other related parties. He continued to pursue his investigation in spite of continued opposition. Reasonable due diligence does not require a plaintiff to exhaust all possible avenues of inquiry. Nor does it require the plaintiff to actually discover his injury. At the very least, however, due diligence does require plaintiffs to do something more than send a single letter to the defendant. If we were to hold that the Appellants exercised reasonable due diligence in this case, it would strip the requirement of any meaningful significance. Therefore, because by early 1990, there were numerous storm warnings that the Appellants failed to adequately investigate, their claims accrued, and the limitations period began to run, on that date.23

_____

23. Because we agree that the Appellants should have discovered their injuries no later than early 1990, we need not consider whether the District Court erred in denying leave to amend their complaint. Even if the Appellants were allowed to include allegations that the prospectus itself was fraudulent, it would not change the outcome of the case. See App. at 44 n.7. Because the Appellants should have discovered Kidder's misrepresentations, whether within or outside the prospectus, more than four years before they filed suit, their claims are barred.

25

VI. Fraudulent Concealment / Equitable Tolling

Finally, the Appellants argue that even if their claims accrued in 1990, the statute of limitations should be tolled due to Kidder's fraudulent concealment of its racketeering activity. "Fraudulent concealment is an `equitable doctrine [that] is read into every federal statute of limitations.' " Davis v. Grusemeyer, 996 F.2d 617, 624 (3d Cir. 1993).

In Rotella, the Supreme Court indicated that RICO's limitation period could be tolled "where a pattern remains obscure in the face of a plaintiff 's diligence in seeking to identify it." 120 S.Ct. at 1084, 528 S.Ct. at 561. We adopted this holding in Forbes, 228 F.3d at 486-88, and held that the plaintiff has the burden of proving the three necessary elements of a fraudulent concealment claim-- (1) "active misleading" by the defendant, (2) which prevents the plaintiff from recognizing the validity of her claim within the limitations period, (3) where the plaintiff 's ignorance is not attributable to her lack of "reasonable due diligence in attempting to uncover the relevant facts." See also Klehr v. A.O. Smith Corp., 521 U.S. 179, 195-96, 117 S.Ct. 1984, 1993 (1997) ("[W]e conclude that `fraudulent concealment' in the context of civil RICO embodies a `due diligence' requirement."). However, when a plaintiff merely seeks to survive summary judgment, there need only be a genuine issue of material fact that the doctrine applies. Thus, a court must determine:

> (1) whether there is sufficient evidence to support a finding that defendants engaged in affirmative acts of concealment designed to mislead the plaintiffs regarding facts supporting their Count I claim, (2) whether there is sufficient evidence to support a finding that plaintiffs exercised reasonable diligence, and (3) whether there is sufficient evidence to support a finding that plaintiffs were not aware, nor should they have been aware, of the facts supporting their claim until a time within the limitations period measured backwards from when the plaintiffs filed their complaint. Absent evidence to support these findings there is no genuine dispute of material fact on the issue and the defendants are entitled to summary judgment.

26

Forbes, 228 F.3d at 487 (citing Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 87–88 (3d Cir. 2000)). Here, we will assume that Kidder actively misled the Appellants.24 Therefore, we must determine whether they exercised "reasonable diligence" in attempting to uncover the facts necessary to support a claim.25

Although a fraudulent concealment defense can offer a tremendous advantage to plaintiffs,26 it is of little practical utility here. In order to avoid summary judgment, there must be a genuine issue of material fact as to whether the Appellants exercised reasonable due diligence in investigating their claim. We have already answered that

_____

24. The Appellants rely primarily upon "optimistic statements" that Kidder included in its quarterly newsletters. See Appellants' Br. at 46. We have carefully reviewed these statements and are skeptical that they amount to active misleading. Nonetheless, because we must draw all reasonable factual inferences in favor of the plaintiffs at the summary judgment stage, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513 (1986), we will assume that they have satisfied the first prong of the fraudulent concealment test.

25. The Appellants claim that they "need not demonstrate due diligence to survive summary judgment." Appellants' Br. at 47. This position is squarely foreclosed by Forbes, 228 F.3d at 487.

26. Upon first inspection, the utility of a fraudulent concealment defense may not be readily apparent. In a civil RICO case where all the requisite elements are present, a claim accrues immediately upon the plaintiff 's discovery of her injury. See Forbes, 228 F.3d at 484. Absent equitable tolling doctrines, ignorance of the remaining elements of her claim, including the pattern required by RICO, is immaterial. A plaintiff has four years from the time she discovers her injury to investigate, gather evidence, and bring suit. At the end of the four years, her claim expires. However, if the defendant misleads the plaintiff to believe that she does not have a claim, fraudulent concealment doctrine tolls the limitations period. Thus, if the defendant conceals any element of the offense, including, but not limited to, the injury itself, the four-year period will be tolled. For this reason, an injury discovery rule that includes equitable tolling approaches an injury and pattern discovery rule. The primary difference is that under an equitable tolling regime, the decision whether to toll the limitations period for lack of pattern discovery is left to the court's discretion. Nonetheless, fraudulent concealment doctrine provides an extremely generous "out" from the potentially harsh injury discovery rule of Forbes.

27

question in the negative. Therefore, we reject the Appellants' fraudulent concealment claim.

VII. Conclusion

For the foregoing reasons, we will affirm the District Court's grant of summary judgment in favor Kidder Peabody & Co., Inc. and the Henry S. Miller Organization.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

28